# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

ROGER WALTERS,

         Plaintiff,

vs.

PRUDENTIAL INSURANCE
COMPANY OF AMERICA, et al.,

         Defendants

No. 06cv0020-LRR

**REPORT AND RECOMMENDATION**

_____

## TABLE OF CONTENTS

I.     *INTRODUCTION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    *FACTUAL BACKGROUND & PROCEEDINGS*. . . . . . . . . . . . . . . . . . 2

III.   *RELEVANT MEDICAL EVIDENCE*. . . . . . . . . . . . . . . . . . . . . . 13

IV.   *RELEVANT PLAN PROVISIONS*. . . . . . . . . . . . . . . . . . . . . . . . 17

V.    *STANDARD OF REVIEW*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VI.   *LEGAL ANALYSIS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
     A.    *Standard of Review to be Applied*. . . . . . . . . . . . . . . . . . . . . 21
     B.    *Whether Prudential's Denial of Long-Term Disability Benefits*
          *to Walters was an Abuse of Discretion*. . . . . . . . . . . . . . . . . . 24
          1.   *Objective Medical Evidence*. . . . . . . . . . . . . . . . . 24
          2.   *Relevant Evidence Submitted by Walters*. . . . . . . . . . . 26
          3.   *Full and Fair Review*. . . . . . . . . . . . . . . . . . . . . 30
          4.   *IME and/or FCE*. . . . . . . . . . . . . . . . . . . . . . . 31

VII.  *ATTORNEY FEES*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VIII. *CONCLUSION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IX.   *RECOMMENDATION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Roger Walters ("Walters") on February 2, 2006, challenging the denial of benefits under the Long-Term Disability Plan included in the MCI Health and Welfare Plan ("Plan") sponsored by Walters' employer, Defendant Verizon Communications, Inc., f/k/a MCI, Inc. ("MCI") and administered by Defendant The Prudential Life Insurance Company of America ("Prudential").[1] Walters requests payment of long-term disability benefits from May, 2003 to the present and payment of future long-term disability benefits pursuant to the terms of the Plan.

## II. FACTUAL BACKGROUND & PROCEEDINGS

Walters was employed by MCI from 1992 through 2002. On November 14, 2002, Walters requested and was granted a medical leave absence from MCI under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. While on medical leave, Walters symptoms worsened and on April 2, 2003, he applied for long-term disability benefits. In his application, Walters reported that he was unable to use his right hand and right arm due to numbness and jolts of shooting pain. Walters also indicated that he was experiencing similar symptoms in his left arm. Walters further stated that he was unable to do any activity requiring the use of both arms or his right hand. Walters provided examples of activities which he was unable to perform, including home maintenance and repairs, mowing the lawn, shoveling snow, and auto maintenance.

On May 20, 2003, Defendant Fox-Everett, Inc. ("Fox-Everett"), the Plan administrator prior to Prudential, denied Walters' claim for long-term benefits. Fox-Everett provided the following reason for denying Walters' claim:

> According to the information on file, your injury is indicated as being Tennis Elbow, for which you received treatment and were released to return to work on 4/9/03 per Dr. James Page

---

[1] In 2003, when Walters initiated his claim for long-term disability benefits under the Plan, the Plan was administered by Defendant Fox-Everett, Inc.

[sic].[2] Your Long Term Coverage would not be effective until
after this return to work date.

(Exhibit 4 attached to Walters' Complaint; Administrative Record at MCI 0345)

On June 9, 2003, Walters appealed the denial of his claim for long-term disability

benefits. In his appeal letter, Walters described his symptoms as follows:

> In March [2003], when the electric jolts moved into my left
> arm and then very quickly into my legs and torso, it turned my
> life upside down. I [had] been healthy all my life, I'm 52 and
> suddenly something is taking over my body and no one can tell
> [me] what is going on. The [o]rthopedic [doctors] referred me
> to Neurology.
>
> There is now a battery of Neurology tests scheduled to try and
> identify what I have. I am unable to use my right arm to lift.
> I can type for 10-15 minutes before the electrical jolts start up
> in both of my arms. I can sit for 10-30 minutes until the [p]ins
> [and n]eedles are so strong that I have [to] get up and move.
> I can get 45 minutes to an hour on my feet before the [p]ins
> [and n]eedles move into my calves and lower back. I'm
> staying close to the bathroom due to the bladder and bowel
> issues. The electrical jolts are being held in check with the
> Nortriptylene provided I don't exert myself too much. In

---

[2] Fox-Everett provided Dr. James M. Pape, M.D., with the following job
description: "[Walters w]as sr. manager for testing of various strategic product efforts.
Responsibilities included management of resources, budgets, people, customer
expectations, etc. Front line management." *See* Administrative Record at MCI 0371. In
a letter to Fox-Everett, dated May 1, 2003, Dr. Pape provided:

> I have reviewed the job description that you have provided and
> I think it would be reasonable for [Walters] to try to return to
> work under these restrictions. Again, I must emphasize that
> I did not originally take [Walters] off work and if [he] is
> unable to tolerate his job duties, he would have to seek follow-
> up and probably work capacity evaluation would have to be
> obtained. At this time, though, per my original medical ability
> report filled out on April 9th, I believe [Walters] could
> proceed with the job duties as outlined.

*See* Administrative Record at MCI 0306.

looking at the big picture, I don't know when I will be able to
go back to work.

(Administrative Record at MCI 0342)  Additionally, Dr. Pape provided Fox-Everett with

a letter dated May 29, 2003 revising his assessment of Walters' ability to return to work.

Dr. Pape's letter provided:

> At this time, [Walters] continues to have discomfort about his
> right upper extremity consistent with his previous exams.  He
> has more discomfort about his other extremities at well.
> [Walters] states that he cannot sit comfortably for any
> significant period of time.  Essentially 10 minutes is . . . about
> as much as he reports he tolerates.
>
> Based on [Walters'] complaints today, as well as his ongoing
> workup from Neurology, I would suggest that [he] would not
> be able to return to work with the restrictions that I provided
> per April 9th and reiterated on the May 1st letter. . . .  It is
> my opinion that the patient is currently in a state of having his
> condition evaluated and I do not think that any permanent
> suggestions could be made regarding his work status certainly
> by me and this may be better determined once his neurologic
> evaluation is completed. . . .  [A]t this point in time I do not
> see how I can render an opinion regarding [Walters'] return to
> work given the multiple other issues that are currently being
> worked up. . . .

(Administrative Record at MCI 0316-17)  On August 4, 2003, Fox-Everett denied Walters'

first appeal.  In a letter dated August 4, 2003, Fox-Everett informed Walters that "[a]fter

careful review of this information, as well as additional information received from you and

Dr. Pape, the decision for denial of your claim to receive Long Term Disability benefits

remains unchanged at this time."[3]

On January 12, 2004, Fox-Everett informed Walters that it no longer handled the

administration of the Plan for MCI and any future correspondence or inquiries should be

---

[3] *See* Exhibit 5 attached to Walters' Complaint.

4

taken up with Prudential.[4]  On January 25, 2004, Walters appealed Fox-Everett's decision denying his first appeal to Prudential.[5]  In his appeal letter to Prudential, Walters described his symptoms as follows:

> This all started from an initial injury on July 25, 2002, when I hurt my right elbow building a deck.  On September 12, 2002, the initial diagnosis was "Tennis Elbow[.]"  On September 16, 2002, my upper outer forearm went numb while icing.  On September 25, 2002, sharp painful electrical jolts started shooting up and down my right arm from just above my elbow into my wrist.  The doctors felt that the inflamation in my elbow was causing the numbness and electrical jolts by pinching the radial nerve/tunnel opening.  I don't believe that the numbness and electrical jolts were related to my elbow. . . .  I have gone to several doctors and have tried various forms of physical therapy to no avail.  On November 14, 2002, I went out on medical leave as my arm wasn't getting better and my work was agitating my arm.  The numbness was spreading and the sharp, painful electrical jolts were happening with greater frequency and intensity. . . .
>
> On March 28, 2003, the electrical jolts I was experiencing in my right arm, started in my left arm.  Within a few days, some of the "Tennis Elbow" symptoms the doctors had been treating me for had just moved into the rest of my body. . . .  Within a few days, the electrical jolts were in my legs.  The entire month of April 2003, I had strange sensations of pressure and tingling start moving around my torso and buttocks and finally into my legs and feet. . . .
>
> To date, this continues [to] spread, as both forearms are numb, there is numbness in both lower legs, numbness in my left abdomen, numbness in between my shoulder blades and the latest on the 13th of January, 2004, my right knee cap went numb.  This numbness I have, I can stick a pin into my skin

---

[4] *See* Exhibit 6 attached to Walters' Complaint; Administrative Record at MCI 0333.

[5] Apparently, Fox-Everett provided Walters with an incorrect address for Prudential and his appeal letter was not received by Prudential until February 10, 2004.

and I don't feel anything. I have pins [and] needles pain in my arms, hands, legs, feet and buttocks that builds all day long and [it is] the worst at night. My hands and feet tend to go numb in the middle of the night. I can sit for about 20 minutes and the pins [and] needles reach a pain level that I have to get up and move. I can stand for about 45 minutes when the pins [and] needles move into my calves and feet and I have to get off of my feet. I try typing at my keyboard and in about 20 minutes the pins [and] needles are shooting through my wrists.

I am extremely sensitive to vibrations. Driving causes me a great deal of pain as the pins [and] needles really intensifies with vibration. I try not to drive very much, as I can't just get up when the pain gets [too] great. I have to pull over and get out. Sometimes my hands go numb while driving. . . . Writing this letter took several sessions to complete as the pins [and] needles build quickly in my wrists when I try to type.

(Administrative Record at MCI 0275) On June 28, 2004, Prudential upheld Fox-Everett's decision denying Walters' claim for long-term disability benefits. In a letter explaining its reasoning, Prudential provided a detailed discussion of the medical records it considered for making its decision to deny benefits to Walters. Specifically, the letter discussed Walters' visits to Dr. Pape on October 7, 2002,[6] November 5, 2002,[7] December 3, 2002,[8]

---

[6] Prudential summarized the findings of Dr. Pape on October 7, 2002 as follows: On physical examination [Walters] revealed full range of motion in flexion, extension, pronations, and supination, exquisite tenderness on resisted dorsiflexion of the wrist, slight decrease in sensation, excellent grip strength, grossly neurovascularly intact distally otherwise. . . . The treatment plan was to proceed with a course of therapy with concentration on anti-inflammatory modalities as well as continuation of anti-inflammatories.

*See* Administrative Record at MCI 0433.

[7] Prudential noted that on November 5, 2002, Dr. Pape found "no significant tenderness on palpatation over the lateral epicondyle." *See* Administrative Record at MCI 0433. Dr. Pape also found "[t]enderness on percussion over the soft tissue of the right forearm in the area of the radial tunnel [and i]ntact sensation and excellent grip strength."

(continued...)

6

and April 1, 2003.[9] The letter also discussed Walters' visits to Dr. Young on April 4, 2003,[10] Dr. Krain on May 21, 2003,[11] and Dr. Ahn on June 17, 2003.[12] Prudential concluded that based on the medical records it reviewed, there was "no objective evidence to support a functional impairment that would preclude [Walters] from performing a sedentary job."[13] Furthermore, Prudential explained that under the terms of the Plan, Walters had to show that he was disabled for a 26 week elimination period before he could be entitled to benefits. Based on Walters' alleged disability onset date of November 14,

_____

[7](...continued)
*See* Administrative Record at MCI 0433.

[8] Prudential noted that on a follow-up visit with Dr. Pape on December 3, 2002, an EMG presented "no finding consistent with nerve compression. On exam [Walters] hade [sic] excellent finger extension and flexion, wrist flexion and extension, elbow flexion and extension." *See* Administrative Record at MCI 0433.

[9] Prudential summarized Dr. Pape's exam of Walters on April 1, 2003, as follows: "On exam [Walters] had positive tinel's, tenderness of the middle finger, no significant tenderness on palpatation over the lateral epicondyle. [Walters was] neurologically intact with good grip strength." *See* Administrative Record at MCI 0433.

[10] Prudential discussed Walters visit to Dr. Young, a hand specialist, on April 4, 2003, and noted that "[o]n physical examination [Walters] had normal symmetric elbow, forearm, wrist, and finger range of motion, two point discrimination is normal . . . [and] no areas of swelling." *See* Administrative Record at MCI 0433.

[11] Prudential noted that Dr. Krain, a neurologist who evaluated Walters, concluded that Walters "had multiple neurological complaints with no specific diagnosis. . . . MRI of head and cervical spine are essentially normal. . . . The brain was also unremarkable." *See* Administrative Record at MCI 0434.

[12] Prudential noted that Dr. Ahn, another neurologist who treated Walters, determined that Walters had a "consistently normal exam except for sensory loss that appears most consistent with nonphysiological." Prudential further noted that Dr. Ahn "strongly suspected that [Walters'] complaints were somatic manifestation of an anxiety disorder." *See* Administrative Record at MCI 0434.

[13] *See* Administrative Record at MCI 0434.

2002, Prudential determined that Walters' elimination period was from November, 2002 through May, 2003. Prudential stated:

> The medical [records] reviewed from November 2002 through May 2003, which is the 26 week [elimination] period, does not support an impairment. . . . In late May, 2003 Dr. Pape submitted a statement stating that he was unable to give an opinion about return to work because you were still undergoing testing. While we appreciate the need for additional testing, there was no evidence during the elimination period that demonstrate[s] a lack of functional capability to perform your job. While you continue with subjective complaints of migrating constellation of symptoms, your exam and diagnostic testing have been unremarkable.
>
> We have thoroughly evaluated the documentation in the file as well as the documentation received for the purpose of your appeal. After reviewing your medical records we have determined that documentation does not support an impairment. We are therefore upholding the decision to disallow you[r] claim.

(Administrative Record at MCI 0434)

On December 14, 2004, Walters appealed, for the third and final time, Prudential's decision to disallow his claim for long-term disability benefits on his second appeal. Between December 14, 2004 and September 22, 2005, Walters submitted a plethora of additional medical records and documents in support of his appeal. On October 6, 2005, Prudential requested that a physician specializing in rheumatology at Reed Review Services review Walters' medical records and provide his or her professional opinion regarding the following:

1.  Based on the documentation reviewed, does [Walters] have functional impairment(s) from November 15, 2002 forward, or for any continuous closed period of time from November 15, 2002 forward? If so, please list the functional impairment(s) and the evidence supporting your opinion.
2.  Please identify appropriate restrictions and/or limitations in terms of [Walters'] ability to sit, stand,

walk, lift, reach, carry, etc., based on the functional impairment(s) you have listed above. Please also note the duration of any applicable restrictions and/or limitations (e.g. temporary or permanent) and the evidence supporting your opinion.

3.    If medical records are indicating significant impairment, please comment on expected treatment, duration and prognosis.

4.    If you opine that [Walters] is not functionally impaired, please provide a detailed explanation supporting your opinion.

(Administrative Record at MCI 0427)  Dr. Tanya Lumpkins, M.D., a rheumatologist employed by Reed Review Services, reviewed Walters' medical records and related documents from 2003-2005 which Walters provided to Prudential.  In response to the first question provided to Reed Review Services by Prudential, Dr. Lumpkins provided:

[Walters] suffered a fracture of the left index middle phalanx fracture and he was noted to be doing well and have some residual loss of motion at the left index finger in the follow up noted [sic] dated 08/2003.  During the time frame of 2003[, Walters] would have functional impairment related to the fine motor manipulation of the left hand.  Prior to the fracture [Walters'] function based on the medical records would support independence with all ADLs, transfers and operation of a motor vehicle.  [Walters] was at the time of the injury to the finger noted to be cutting his grass.  Therefor[e] prior to the injury [Walters] was functional physically beyond that required of a sedentary position. . . .  The diagnosis of fibromyalgia that is opined to be dated to November of 2002 is consistent with the ACR criteria based on the complaints of wide spread pain, non-restorative sleep and the presence of tender points from later physical examinations.  The medical records fail to document impairment of physical function of sufficient severity to preclude [Walters] from performing the routine duties of a sedentary position.  The evaluations by neurology failed to document a neurological deficit of sufficient severity to preclude normal physiological function of the musculoskeletal or neurological systems.

(Administrative Record at MCI 0025) In response to Prudential's second question, Dr. Lumpkins provided the following restrictions for Walters: (1) He would be able to sit up to eight hours; (2) he would be able to stand and walk up to two to three hours in an eight-hour day; and (3) he would be able to reach, lift, and carry up to 20 pounds. Dr. Lumpkins also noted that Walters would have had "restrictions in the fine motor manipulations of data entry 06/2003 through 12/2003 based on the documented fracture of the left index finger."[14] In response to Prudential's third question, Dr. Lumpkins determined that Walters' medical records failed to indicate any significant impairment of physical function beyond the impairments discussed in questions one and two. In response to Prudential's fourth question, Dr. Lumpkins provided:

> [Walters] is expected on the medical records forward to be independent with ambulation, activities of daily living, transfers and operation of a motor vehicle. The records regarding the index finger fracture note the injury occurred when he was mowing the grass in 2003, this is a physical function beyond that required of a sedentary position. There has been no documentation of decreased musculoskeletal function or neurological deficits in the physical examinations or objective data. [Walters] has been diagnosed with sleep apnea 05/24/2005 by Dr. Fortson. This is considered a treatable medical diagnosis with the institution of CPAP. It would not be expected to contribute to physical limitations beyond decrease cognitive function and daytime fatigue; however it may have contributed to many of [Walters'] subjective complaints.

(Administrative Record at MCI 0026)

On December 21, 2005, Prudential upheld the decisions on Walters' two previous appeals and denied his claim for long-term disability benefits. In making its decision, Prudential noted that the material duties of Walters' occupation requires an individual to plan, direct, and coordinate activities for designated projects and to ensure that the goals and objectives of the projects are accomplished within the prescribed time frame and

---

[14] *See* Administrative Record at MCI 0026.

funding parameters. Prudential further noted that the physical demands of such an occupation would require the occasional need to "lift, carry, push and pull a negligible amount of weight, have occasional use of upper extremities for reaching, handling, and fingering activities," and perform this work from a seated position with the "occasional need for standing or walking during the course of the work day."[15] In discussing Walters' medical history and its decision to deny Walters' claim for long-term disability benefits, Prudential acknowledged that Walters broke his finger in June, 2003. Prudential also acknowledged that such a fracture would have caused a mild functional impairment related to the fine motor manipulation of Walters' hand from June, 2003 to December, 2003. Prudential, however, determined that "[p]rior to the fracture, the records in [Walters'] file supported a functional level that would allow for independence with all his activities of daily living, transfers and operation of a motor vehicle."[16] Prudential further determined that:

> The information in his file indicated that prior to the injury [to Walters'] finger, his physical functional capacity exceeded that required of a sedentary position such as his regular occupation. After the follow-up in August 2003 it was noted that he had decreased range of motion of his left index finger. This would create a mild impairment of fine motor manipulation related to data entry for a period of time after June 2003, after the end of the elimination period in early 2003. The diagnosis of fibromyalgia was consistent with the ACR criteria based on the complaints of wide spread pain, non-restorative sleep and the presence of tender points from later physical examinations. However, it was supported by the information in the file only in 2004, long after the required elimination period had expired.

(Administrative Record at MCI 0418) Prudential concluded that:

> [T]he medical records fail to document impairment of physical function of sufficient severity to preclude [Walters] from

---

[15] *See* Administrative Record at MCI 0416-17.

[16] *See* Administrative Record at MCI 0418.

performing the material and substantial duties of his regular, sedentary occupation on a continuous basis throughout and beyond the elimination period from November 15, 2002 through May 13, 2003. As such, [Walters] did not satisfy the elimination period requirement under the policy and was not entitled to receive disability benefits.

(Administrative Record at MCI 0418)

On February 2, 2006, Walters filed a Complaint (docket number 3) under the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B)[17] to recover long-term disability benefits under the Plan. On March 10, 2006, Defendants Prudential, the Plan, and MCI filed an Answer (docket number 8). On December 6, 2006, Walters filed a Motion for Summary Judgment (docket number 19), including the Statement of Undisputed Facts (docket number 19-2), Memorandum of Authorities in Support of Motion for Summary Judgment (docket number 19-3), and Appendix (docket number 22).[18] On March 9, 2007, Defendants Prudential, the Plan, and MCI filed a Brief and Argument on the Merits (docket number 27). On May 1, 2007, Walters filed a Reply Brief and Argument on the Merits (docket number 37). On August 28, 2007, Chief Judge Linda R. Reade referred this matter to the undersigned for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

---

[17] 29 U.S.C. § 1132(a)(1)(B) provides in pertinent part:
> A civil action may be brought--
>> (1) by a participant or beneficiary--
>>> (B) to recover benefits due to him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan.

[18] In his reply brief, Walters concedes that the brief was erroneously filed in conjunction with a motion for summary judgment. Walters states that his counsel "mistakenly styled [his] brief in the form of a summary judgment motion, but intends for it to be treated as a brief on the merits." *See* Walters' Reply Brief at 1. Motions for summary judgment should not be filed in claim-review cases brought under ERISA. Local Rule 56.1.h.

## III. RELEVANT MEDICAL EVIDENCE

On July 25, 2002, Walters injured his right elbow while building a deck. On September 12, 2002, Walters visited his family physician, Dr. Yang Ahn, M.D., regarding pain in his right elbow. Dr. Ahn diagnosed Walters with lateral epicondylitis (tennis elbow). Walters returned to Dr. Ahn on October 4, 2002, complaining of numbness in his right elbow and wrist and electrical jolts of pain going down his arm. Dr. Ahn referred Walters to Dr. James M. Pape.

Walters saw Dr. Pape on October 7, 2002. After examining Walters, Dr. Pape also diagnosed him with tennis elbow. On November 5, 2002, Walters had a follow-up visit with Dr. Pape. After examining Walters, Dr. Pape noted no significant tenderness or palpation over the lateral epicondyle, some tenderness over the soft tissue of his right forearm in the area of the radial tunnel, and intact sensation of the volar aspect of his hand with excellent grip. Dr. Pape concluded that the cause of Walters' continued discomfort could be neurologic. Dr. Pape ordered an EMG of Walters' right arm. The EMG was normal. Walters had another follow-up visit with Dr. Pape on January 29, 2003. Dr. Pape examined Walters and noted "significant tenderness on palpation over the dorsal forearm in the area of the mobile wad as well as a positive Tinel's sign."[19] Dr. Pape also noted "some tenderness on resisted dorsiflexion of his wrist and middle finger."[20] Dr. Pape concluded that Walters was suffering from some irritability of the superficial radial nerve branch. Dr. Pape treated Walters with a cortisone shot. Walters returned to Dr. Pape on April 1, 2003, for a follow-up appointment. Walters informed Dr. Pape that his symptoms had not changed and he had started experiencing similar symptoms on his left side. Dr. Pape continued his diagnosis of radial tunnel syndrome on the right, but also referred Walters to Dr. Melissa Young Szalay, M.D., for a second opinion.

---

[19] *See* Walters' Appendix (docket number 22) at 23; Administrative Record at MCI 0312.

[20] *Id.*

On April 4, 2003, Dr. Young Szalay examined Walters and provided the following observations:

> On inspection of the right upper extremity, there are no areas of localized swelling. [Walters] is tender to palpation over the lateral epicondyle and radial tunnel. [Walters] has positive provocative signs with resisted wrist extension, finger extension, and supination. . . .

> On inspection of the left upper extremity there is no swelling. [Walters] is nontender over the lateral epicondyle, mildly tender over the radial tunnel. Provocative signs are negative with resisted wrist extension, finger extension, and supination.

(Walters' Appendix (docket number 22) at 20; Administrative Record at MCI 0309) Dr. Young Szalay further noted that Walters had X-rays in the past which were unremarkable and EMG which was normal. Dr. Young Szalay diagnosed Walters with right elbow lateral epicondylitis and radial tunnel syndrome and left forearm and leg paraesthesias. Dr. Young Szalay prescribed Bextra and encouraged Walters to continue physical therapy and try pool therapy as treatment. Dr. Young Szalay also treated Walters by giving him a corticosteroid injection into his right radial tunnel.

On June 5, 2003, at a follow-up visit with Dr. Laurence S. Krain, M.D.,[21] Dr. Krain opined that Walters "has a constellation of symptoms which is very difficult to localize neurologically. I am quite concerned about a somatic manifestation of an underlying psychiatric disease such as anxiety or depression."[22] In another follow-up visit, on June 19, 2003, Dr. Krain reaffirmed his conclusion that Walters suffers from a constellation of symptoms that cannot be localized. Dr. Krain's progress notes, dated June 19, 2003, provide:

> [Walters has] had consistently normal examinations except for sensory loss that appears most consistent with nonphysiological. Nerve conductions in the distribution of his

---

[21] Walters' first visited Dr. Krain on May 21, 2003.

[22] *See* Administrative Record at MCI 0322.

forearm have been normal. [Walters h]as had extensive workup including unremarkable MRI per the University of Iowa Hospital's review, my review and subsequent over-read by radiology here. . . .

At this point I've informed [Walters] again that I strongly suspect that we are looking [at] a somatic manifestation of an anxiety disorder. I really cannot diagnose alternative neurological disease based on history, examination and workup. . . .

(Administrative Record at MCI 0319) Dr. Krain set up neuropsychological testing to further evaluate Walters symptoms.

Walters was examined by Dr. Robert D. Jones, Ph.D., a neuropsychologist at the University of Iowa Hospitals and Clinics. Dr. Jones provided the following impressions based on the neuropsychological exam:

Taking our data at face value[, Walters] has weaknesses in anterograde memory and attention of unclear etiology. [Walters'] psychological profile reflects clinical scales indicating marked somatic concern and distress, but it is not clear to us that this concern and distress can fully account for his cognitive impairments. Performances were normal on tests of arithmetic skills, fund of information, constructional praxis, spatial reasoning, speech and language, and higher visual functions.

(Exhibit 9 attached to Walters' Complaint (docket number 3-15) at 1) Dr. Jones concluded that Walters' memory and attention defects are mild and should not interfere with the successful completion of daily activities.

In August 2004, Dr. Shahin Bagheri, M.D., a rheumatologist, examined Walters and diagnosed him with (1) diffuse myalgias, arthralgias, and pain for about two years, (2) depression and anxiety without suicidal ideation, and (3) disturbed and non-refreshing sleep. Dr. Bagheri also noted that there was no evidence of synovitis in Walters' physical examination and that Walters had undergone an extensive neurological workup with negative results. Dr. Bagheri further noted that Walters meets the diagnostic criteria for fibromyalgia with "disturbed sleep and non-refreshing sleep, arthralgias and myalgias

without evidence of synovitis . . . and 18/18 tender spots in the examination with negative control spots."[23] Dr. Bagheri suggested water exercises through physical therapy and a gradual increase in the intensity of exercising to light aerobic exercise as treatment. Dr. Bagheri also noted that Walters' management of his fibromyalgia will likely be unsuccessful until his underlying depression and anxiety is appropriately treated.

On September 20, 2004, Walters visited the Rheumatology Clinic at the University of Iowa Hospitals and Clinics. Walters was examined by Dr. Rebecca Tuetken, M.D. Dr. Tuetken diagnosed Walters with chronic neuropathic pain with an unclear etiology, diffuse tenderness which is consistent with fibromyalgia, chronic sleep disturbance, and elevated liver transaminases with elevated GGT. Dr. Tuetken explained to Walters that even though his exam findings were consistent with fibromyalgia, "the label of fibromyalgia describes the result (diffuse pain and tenderness) and does not in and of itself indicate the cause for his problems. This typically results from some combination of chronic sleep disturbance, depression, other medical illness, and deconditioning."[24]

In a letter dated May 27, 2005, Dr. Thomas J. Romano, M.D., Ph.D., provided an assessment of the diagnosis of fibromyalgia based on his review of Walters' medical records. Dr. Romano's letter provided: "Judging from the medical record it is my professional opinion, to a reasonable degree of medical certainty, that [Walters] did, in fact, suffer from fibromyalgia and that the fibromyalgia probably started on or about November 14, 2002."[25] Dr. Romano further stated that Walters was unable to perform the material and substantial duties of his employment from November 14, 2002 through May 13, 2003 and was unable to perform the material and substantial duties of his employment from May 13, 2003 to the present due to fibromyalgia. Dr. Romano further opined that the pain caused by Walters' fibromyalgia combined with his problems with

---

[23] *See* Administrative Record at MCI 0164.

[24] *See* Administrative Record at MCI 0226.

[25] *See* Administrative Record at MCI 0066.

memory and concentration, psychological problems, and sleep problems makes it impossible for Walters to perform the duties of any occupation. Dr. Romano summarized his finding as follows:

> [I]n my opinion, to a reasonable degree of medical certainty, I believe that [Walters] does indeed have fibromyalgia, has had it at least since November 14, 2002 and that he has been disabled because of the fibromyalgia from 11/14/02 to the present is likely to continue so.

(Administrative Record at MCI 0068)

On May 16, 2005, Walters visited Dr. Mark W. Fortson, M.D., regarding his chronic pain. After reviewing Walters' medical history and examining him, Dr. Fortson determined that he "most likely has fibromyalgia."[26] Additionally, Dr. Fortson ordered Walters to participate in a sleep study. After reviewing the results of the sleep study, Dr. Fortson diagnosed Walters with obstructive sleep apnea. Walters was treated with a CPAP at 7 centimeters H20. Other medical evidence that is significant to making a determination on Walters' ERISA Complaint will be discussed, as necessary, in the Court's consideration of the legal issues presented.

## IV. RELEVANT PLAN PROVISIONS

The Summary Plan Description ("SPD") for the Plan provides that a long-term disability benefit is available to an employee covered by the Plan, if he or she becomes disabled from a covered accidental bodily injury, sickness, or pregnancy. The long-term disability portion of the Plan is self-insured and maintained by MCI with assets held in trust. MCI pays the full cost of an employee's long-term disability benefits at 60% of the employee's salary.

In order to receive long-term disability benefits under the Plan, an employee must meet the following criteria: (1) The employee must become disabled under the Plan; (2) the employee must be disabled through the elimination period; (3) the employee must remain disabled beyond the elimination period; (4) the employee must be under the regular

---

[26] *See* Administrative Record at MCI 0055.

care of a physician and have been under such care during the elimination period; and

(5) the employee must submit proof of loss satisfactory to the disability carrier. The SPD

defines "disability" in the following manner:

> *Disability*--During the elimination period, you are disabled when:
> - you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
> - you are not working at any job.
> - After the elimination period, you are disabled when:
>   - you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
>   - you have a 20% or more loss in weekly earnings due to the same sickness or injury.
>   - The loss of a professional or occupational license or certification does not, in itself, constitute a disability.
>
> You may be required to be examined by specified doctors, other Medical practitioners or vocational experts. Your Employer will pay for these examinations. Examinations may be required as often as it is reasonable to do so. You may also be required to be interviewed by an authorized representative. Refusal to be examined or interviewed may result in denial or termination of your claim.

(Administrative Record at MCI 0516) The "elimination period" is the period of time an

employee must be disabled before benefits become payable. Specifically, the elimination

period is the later of (1) the first 180 consecutive days of any one period of disability; or

(2) the expiration of any MCI sponsored short-term disability benefits or salary continuation

program.[27] Proof of loss for long-term disability benefits may be shown by, but is not

limited to, the following types of documentation: (1) The date the employees' disability

began; (2) the cause of the employees' disability; (3) the prognosis of the employees'

disability; (4) the employees' earnings and income; and (5) evidence that the employee is

---

[27] *See* Administrative Record at MCI 0519-20.

under the regular care of a physician.[28] Such documentation may include "any and all medical information including X-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes."[29] Lastly, all proof submitted by an employee must be satisfactory to the disability carrier.

## V.  STANDARD OF REVIEW

"'ERISA provides a plan beneficiary with the right to judicial review of a benefits determination.'" *Shelton v. ContiGroup Companies, Inc.*, 285 F.3d 640, 642 (8th Cir. 2002) (quoting *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998)).  Review of plan determinations is *de novo*, unless the plan provides discretionary authority to the plan administrator "'to determine eligibility for benefits or to construe the terms of the plan.'" *Johnson v. U.S. Bancorp Broad-Based Change in Control Severance Pay Program*, 424 F.3d 734, 738 (8th Cir. 2005) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  In this case, Prudential is given discretion to determine eligibility for plan benefits and interpret the plan's terms.[30] When a plan administrator is given such discretion, the court must review a decision by the administrator for abuse of discretion. *Shelton*, 285 F.3d at 642.  "'This deferential standard reflects [the] general hesitancy to interfere with the administration of a benefits plan.'" *Id.* (quoting *Layes v. Mead Corp.*, 132 F.3d 1246, 1250 (8th Cir. 1998)).  In *Hunt v. Metropolitan Life Insurance Co.*, 425 F.3d 489 (8th Cir. 2005), the Eighth Circuit Court of Appeals described this standard of review as follows:

> Because the plan gives [the plan administrator] discretion to determine eligibility, we review the administrator's decision for abuse of discretion.  Under this standard of review, we consider

---

[28] *See* Administrative Record at MCI 0528.

[29] *See* Administrative Record at MCI 0528.

[30] In the document labeled "MCI, Inc. Administrative Services for Long Term Disability Plan," Prudential, as claims administrator, "has been delegated the responsibility to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits." *See* Administrative Record at MCI 0577.

> whether the administrator adopted a "reasonable interpretation"
> of uncertain terms in the plan, and whether the administrator's
> decision was supported by substantial evidence.

*Id.* at 490 (citations omitted). When the abuse of discretion standard is applied, the reviewing court "must affirm if a 'reasonable person could have reached a similar decision, given the evidence before him [or her], not that a reasonable person would have reached that decision.'" *Smith v. Unum Life Insurance Co. of America*, 305 F.3d 789, 794 (8th Cir. 2002) (quoting *Ferrari v. Teachers Ins. and Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002)). A reasonable decision is a decision which is based on substantial evidence that was before the plan administrator. *Id.* Substantial evidence is evidence which a reasonable mind could accept as adequate to support a conclusion. *Johnson*, 424 F.3d at 738.

"When reviewing a denial of benefits by an administrator who has discretion[,] . . . a reviewing court, 'must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales.'" *King v. Hartford Life and Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (quoting *Conley v. Pitney Bowes*, 176 F.3d 1044, 1049 (8th Cir. 1999)). Furthermore,

> an administrator with discretion under a benefit plan must
> articulate its reasons for denying benefits when it notifies the
> participant or beneficiary of an adverse decision, and the
> decision must be supported by both a reasonable interpretation
> of the plan and substantial evidence in the materials considered
> by the administrator.

*King*, 414 F.3d at 1000.

A less deferential standard of review may be applied if a plaintiff presents "'material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty' to the plaintiff." *Shelton*, 285 F.3d at 642 (quoting *Woo*, 144 F.3d at 1160). An alleged conflict of interest or procedural irregularity must be connected in some way to the substantive decision reached by the plan administrator. *Id.* "A claimant must offer evidence that 'gives rise to serious doubts as to whether the result reached was the product

of an arbitrary decision or the plan administrator's whim'" for a less deferential standard to be applied. *Id.* (quoting *Layes*, 132 F.3d at 1250).

## VI. LEGAL ANALYSIS

### A. Standard of Review to be Applied

Walters argues that the less deferential standard of review articulated in *Shelton* should be applied in this case because Prudential's requirement that he submit objective medical evidence of his disability and Prudential's failure to obtain an independent medical examination ("IME") or functional capacity evaluation ("FCE") for determining whether he was disabled constitutes procedural irregularities. Walters relies primarily on *Payzant v. UNUM Life Ins. Co. of America*, 402 F. Supp.2d 1053 (D. Minn. 2005) to support his assertion that Prudential's determination to deny him disability benefits was mired by procedural irregularities. In *Payzant*, the United States District Court for the District of Minnesota determined that a procedural irregularity occurred when the plan administrator failed to obtain an FCE for a plaintiff suffering from an uncommon disease such as fibromyalgia when the record contained evidence that the plaintiff's doctors diagnosed her with fibromyalgia and requested an FCE to complete her disability determination. *Id.* at 1062. In *Payzant*, the court also determined the plan administrator's requirement that the plaintiff provide objective medical evidence of fibromyalgia was a procedural irregularity because "current medicine regards [fibromyalgia] as a subjective disease." *Id.* at 1063-64.

In response, Prudential argues that to the extent it required objective evidence, it was permitted to do so under the Plan. Specifically, Prudential asserts that the Plan language required Walters to submit proof of loss that it found satisfactory. Prudential points out that the Plan provides that proof of loss can be shown by several types of documentation, including "any and all medical information including X-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes."[31] Thus, Prudential maintains that under the Plan, any requirement or consideration

---

[31] *See* Administrative Record at MCI 0528.

of objective evidence for determining whether Walters was disabled did not constitute a procedural irregularity. Prudential further argues that failure to obtain an IME or FCE was also not a procedural irregularity. Prudential contends that such evaluations were unnecessary because it determined that Walters was not disabled during the elimination period and "any later medical examination undertaken could not support a determination of [d]isability during that period."[32]

In this case, the Plan requires proof of loss which is satisfactory to the disability carrier in order to obtain long-term disability benefits. Proof of loss may be shown by, but is not limited to, the following types of documentation: (1) The date the employees' disability began; (2) the cause of the employees' disability; (3) the prognosis of the employees' disability; (4) the employees' earnings and income; and (5) evidence that the employee is under the regular care of a physician.[33] Such documentation may include "any and all medical information including X-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes."[34] In the final appeal decision, Prudential did not specifically deny Walters' claim based on a lack of objective evidence.[35] Instead, Prudential determined that "the medical records fail to document impairment of physical function of sufficient severity to preclude [Walters] from performing the material and substantial duties of his regular, sedentary occupation on a continuous basis throughout and beyond the elimination period from November 15, 2002

---

[32] *See* Prudential's Brief at 38.

[33] *See* Administrative Record at MCI 0528.

[34] *See* Administrative Record at MCI 0528.

[35] In the second appeal decision, dated June 28, 2004, however, Prudential did state that it based its decision, in part, on a lack of objective medical evidence. Specifically, Prudential stated "[b]ased on medical information reviewed, there is no objective medical evidence to support a functional impairment that would preclude [Walters] from performing a sedentary job." *See* Exhibit 7 attached to Walters' Complaint.

through May 13, 2003. As such, [Walters] did not satisfy the elimination period requirement under the policy and was not entitled to receive disability benefits."[36]

In *Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 838 (8th Cir. 2006), the Eighth Circuit Court of Appeals stated:

> This is not a case where the plan trustee failed to inquire into the relevant circumstances at issue, or never offered a written decision that can be reviewed, or committed irregularities so severe that the court 'has a total lack of faith in the integrity of the decision making process.' What we have here is a dispute over whether the administrator reasonably interpreted the plan to require objective medical evidence to prove the claimant's disability, and whether the record supports the administrator's exercise of judgment that benefits should be denied based on the evidence that was presented. The administrator's decision-whether right or wrong, reasonable or unreasonable-was not made 'without knowledge of or inquiry into the relevant circumstances and merely as a result of its arbitrary decision or whim.' The normal standard of review is thus appropriate.

*Id.* (internal citations omitted). *See also Johnson v. Metropolitan Life Ins. Co.*, 437 F.3d 809, 813 (8th Cir. 2006) ("Johnson's benefit plan requires that she 'provide documented proof' of her disability which includes, but is not limited to, the date, cause, and prognosis of her disability. . . . This language resembles the terms of the plan at issue in *Pralutsky*, in which we held that it was reasonable for the administrator to interpret the plan to require objective evidence as part of the proof and documentation that a claimant was required to submit."). The record demonstrates that Prudential considered the evidence presented by Walters and its decision was made with knowledge and inquiry into the relevant circumstances of Walters' condition. Accordingly, the Court finds that any consideration of objective medical evidence by Prudential did not constitute a procedural irregularity warranting a less deferential standard of review.

Furthermore, unlike *Payzant*, Walters points to nothing in the record which provides that any of his doctors suggested an IME or FCE was necessary to determine whether he

---

[36] *See* Administrative Record at MCI 0418.

was disabled.[37] *See Payzant*, 402 F. Supp.2d at 1062 ("Therefore, UNUM's failure to obtain an IME or FCE to evaluate Payzant's subjective illness when both Payzant's treating doctors, including a rheumatologist, requested a FCE to complete the disability determination, is a procedural irregularity."). Because the Plan did not require Prudential to obtain an IME or FCE, and Prudential considered the evidence presented by Walters and its decision was made with knowledge and inquiry into the relevant circumstances of Walters' condition, the Court finds that Prudential's decision not to obtain an IME or FCE was not a procedural irregularity warranting a less deferential standard of review. Therefore, the Court will apply the abuse of discretion standard articulated in section *V* above.

### B. Whether Prudential's Denial of Long-Term Disability Benefits to Walters was an Abuse of Discretion

In his brief and reply brief, Walters presents several arguments which can be distilled into four basic arguments that Prudential's decision to deny him long-term disability benefits was an abuse of discretion. Walters argues that Prudential abused its discretion by (1) requiring objective medical evidence of his disability, (2) failing to consider relevant evidence he submitted, (3) failing to allow him a full and fair opportunity to review the evidence Prudential relied on for its decision, and (4) failing to conduct an IME and/or FCE.

### 1. Objective Medical Evidence

Walters argues that the Plan does not require objective evidence of a disability to receive benefits. Walters further argues that objective evidence is impossible in a fibromyalgia case because fibromyalgia is a disease characterized by subjective complaints.

---

[37] It should be noted that in a letter dated May 1, 2003, Dr. Pape states: "I must emphasize that I did not originally take [Walters] off work and if [he] is unable to tolerate his job duties, he would have to seek follow-up and probably work capacity evaluation would have to be obtained." Dr. Pape does not suggest that an FCE is necessary to diagnose Walters with a disability, he simply states that if Walters cannot perform his work duties an FCE may be appropriate. Furthermore, in that particular letter, Dr. Pape contends that Walters is capable of returning to work. Thus, Dr. Pape is clearly not suggesting that Walters needs an FCE to determine whether he is disabled.

Walters relies on *House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045 (8th Cir. 2001) for the proposition that when a disability plan does not specifically require objective medical evidence to prove the disability, requiring such evidence is an abuse of discretion. *Id.* at 1048.

Similar to its argument regarding the applicable standard of review, Prudential maintains that to the extent it required objective evidence, it was permitted to do so under the Plan. Specifically, Prudential asserts that the Plan language required Walters to submit proof of loss that it found satisfactory. Prudential points out that proof of loss can be shown by several types of documentation, including "any and all medical information including X-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes."[38] Prudential argues that it is not an abuse of discretion to require objective evidence of a disability when such language is provided in the Plan.

The Eighth Circuit Court of Appeals has held that "[i]t is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence." *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 925 (8th Cir. 2004) (citing *Coker v. Metro. Life Ins. Co.*, 281 F.3d 793, 799 (8th Cir. 2002)). The type of evidence required to prove a disability benefits claim, however, depends upon the terms of the plan and the circumstances of the case. *Johnson*, 437 F.3d at 813 (citations omitted). In *Johnson*, the plan language required "documented proof" of her disability, which included, but was not limited to, "the date, cause, and prognosis of her disability." *Id.* This language made it "reasonable for the administrator to interpret the plan to require objective evidence as part of the proof and documentation that a claimant was required to submit." *Id.* (citation omitted).

In this case, the Plan requires proof of loss which is satisfactory to the disability carrier in order to obtain long-term disability benefits. Proof of loss may be shown by, but is not limited to, the following types of documentation: (1) The date the employees'

---

[38] *See* Administrative Record at MCI 0528.

disability began; (2) the cause of the employees' disability; (3) the prognosis of the employees' disability; (4) the employees' earnings and income; and (5) evidence that the employee is under the regular care of a physician.[39] Such documentation may include "any and all medical information including X-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes."[40] This language is similar to the language in *Johnson* and distinguishable from the language in *House*. In *House*, the plan language provided that the plan administrator had the right to investigate submitted claims and "may require medical exams or written proof of financial loss." *House*, 241 F.3d at 1048. Unlike the language in *Johnson*, the Eighth Circuit Court of Appeals found that the language in *House* did not allow a determination on the basis of objective medical evidence. *Id*. In this case, however, the language in the Plan is similar to the language in *Johnson* and not like the language in *House*; therefore, the Court finds that Prudential did not abuse its discretion in relying on objective medical evidence for determining whether Walters was entitled to long-term disability benefits.

### 2. *Relevant Evidence Submitted by Walters*

Walters argues that Prudential abused its discretion in determining that he was not entitled to long-term disability benefits because it failed to consider the medical report provided by Dr. Romano and the vocational report provided by Barbara Laughlin, M.A. ("Laughlin"). Walters points out that Dr. Romano reviewed his medical records and determined that he suffered from fibromyalgia dating back to 2002 during the elimination period and through the present time. Walters further points out that Laughlin determined that he could not perform the "material and substantial duties" of his job at the time of the elimination period and through the present time due to his disability.[41] Walters argues that

_____

[39] *Id*.

[40] *Id*.

[41] *See* Administrative Record at MCI 0140. Specifically, Laughlin provided the following conclusions in her report: (1) Walters was unable to perform the material and
(continued...)

because Prudential based its decision to deny him benefits on a finding that he was not disabled during the elimination period, Prudential abused its discretion by not considering or discussing in its decision the findings of Dr. Romano and Laughlin that he was disabled during the elimination period.

Prudential offers a short reply and states that it relied upon the findings of Dr. Lumpkins, the Reed Review Services rheumatologist that reviewed Walters' medical records for Prudential, for its determination that Walters was not disabled during the elimination period. Prudential maintains that Dr. Lumpkins was provided with the reports from Dr. Romano and Laughlin. Because Dr. Lumpkins had access to the reports, Prudential contends that it "did not ignore those reports in reaching [its] decision that Walters was not [d]isabled [during the elimination period.]"[42] Prudential concludes "[t]o the extent that there is not specific reference to the materials cited by Walters, that does not constitute evidence that Prudential failed to consider the materials. Rather, it is simply an indication that Prudential did not feel the need to address the particular materials cited."[43]

Under ERISA, a plan administrator must take "into account all comments, documents, records, and other information submitted by the claimant relating to the claim." 29 C.F.R. § 2560.503-1(h)(2)(iv). Additionally, the plan administrator

> must articulate its reasons for denying benefits when it notifies
> the participant or beneficiary of an adverse decision, and the
> decision must be supported by both a reasonable interpretation

---

[41] (...continued)
substantial duties of his job from November 14, 2002 through May 13, 2003; (2) Walters was unable to perform the material and substantial duties of his job from May 13, 2003 through the present; (3) Walters is unable to perform any occupation for which he is qualified by education, training, or experience on May 13, 2005; and (4) Walters is unable to perform skilled, semi-skilled, or unskilled work in the competitive market. *See* Administrative Record at MCI 0140.

[42] Prudential's Brief at 43.

[43] *Id.*

> of the plan and substantial evidence in the materials considered
> by the administrator.

*King*, 414 F.3d at 1000. A decision is reasonable "'if a reasonable person could have reached a similar decision, given the evidence before him [or her], not that a reasonable person would have reached that decision.'" *Clapp v. Citibank, N.A. Disability Plan (501)*, 262 F.3d 820, 828 (8th Cir. 2001) (quoting *Cash v. Wal-Mark Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997)). Substantial evidence is evidence which a reasonable mind could accept as adequate to support a conclusion. *Johnson*, 424 F.3d at 738.

In Prudential's final decision on Walters' third appeal, dated December 21, 2005, it noted the following "medical information:" (1) Walters' broken finger in June, 2003; (2) a progress note from Dr. Krain, dated June 19, 2003; (3) a statement from Dr. Pape, dated April 9, 2003;[44] (4) Dr. Bagheri's assessment from August 17, 2004, that Walters fulfilled the diagnostic criteria for fibromyalgia; and (5) progress notes from Dr. Fortson in May, 2005.[45] In its explanation for denying benefits to Walters, Prudential focused on his broken finger which he suffered while mowing his lawn in June, 2003. Prudential noted that Walters' broken finger would cause a mild functional impairment to his hand. Prudential, however, determined that "[p]rior to the fracture, the records in [Walters'] file supported

---

[44] It should be noted that Prudential's reliance on Dr. Pape's letter, dated April 9, 2003, is questionable because in another letter, dated May 29, 2003, Dr. Pape retracted his opinions from the April 9, 2003 letter. In the letter, dated May 29, 2003, Dr. Pape provided: "I would suggest that [he] would not be able to return to work with the restrictions that I provided per April 9th and reiterated on the May 1st letter. . . . It is my opinion that the patient is currently in a state of having his condition evaluated and I do not think that any permanent suggestions could be made regarding his work status certainly by me and this may be better determined once his neurologic evaluation is completed." *See* Administrative Record at MCI 0316-17.

[45] *See* Administrative Record at MCI 0417.

a functional level that would allow for independence with all his activities of daily living, transfers and operation of a motor vehicle."[46] Prudential further determined that:

> The information in his file indicated that prior to the injury [to Walters'] finger, his physical functional capacity exceeded that required of a sedentary position such as his regular occupation. After the follow-up in August 2003 it was noted that he had decreased range of motion of his left index finger. This would create a mild impairment of fine motor manipulation related to data entry for a period of time after June 2003, after the end of the elimination period in early 2003. The diagnosis of fibromyalgia was consistent with the ACR criteria based on the complaints of wide spread pain, non-restorative sleep and the presence of tender points from later physical examinations. However, it was supported by the information in the file only in 2004, long after the required elimination period had expired.

(Administrative Record at MCI 0418) Prudential concluded that:

> [T]he medical records fail to document impairment of physical function of sufficient severity to preclude [Walters] from performing the material and substantial duties of his regular, sedentary occupation on a continuous basis throughout and beyond the elimination period from November 15, 2002 through May 13, 2003. As such, [Walters] did not satisfy the elimination period requirement under the policy and was not entitled to receive disability benefits.

(Administrative Record at MCI 0418)

Prudential, at no point in its decision, mentions Dr. Romano's report which provides that Walters' was disabled with fibromyalgia during the elimination period. Prudential acknowledged that Walters' symptoms were consistent with fibromyalgia, but it claims that his diagnosis of fibromyalgia did not occur until 2004 which was "long after the required elimination period."[47] The record demonstrates, however, that in addition to Dr. Romano's conclusion that Walters was disabled with fibromyalgia during the elimination period, Dr. Bagheri's diagnosis of fibromyalgia also included the elimination period. Specifically,

---

[46] *See* Administrative Record at MCI 0418.

[47] *See* Administrative Record at MCI 0418.

in August, 2004, Dr. Bagheri found Walters to have had "[d]iffuse myalgias, arthralgias, and pain for about two years."[48] Dr. Bagheri's diagnosis of Walters having fibromyalgia two years prior to 2004 would include the elimination period of November 14, 2002 to May 13, 2003. Furthermore, Dr. Romano specifically stated that "[j]udging from the medical record it is my professional opinion, to a reasonable degree of medical certainty, that [Walters] did, in fact, suffer from fibromyalgia and that the fibromyalgia probably started on or about November 14, 2002."[49] Dr. Romano further states that Walters was unable to perform the material and substantial duties of his employment from November 14, 2002 through May 13, 2003 and was unable to perform the material and substantial duties of his employment from May 13, 2003 to the present due to fibromyalgia. Furthermore, Laughlin, a vocational expert, opined that Walters could not perform the material and substantial duties of his job or any job from November 14, 2002 to May 13, 2003, the elimination period, or from November 14, 2002 to the present. Prudential does not mention Laughlin's opinion at any point in its decision to deny benefits to Walters.

### 3. Full and Fair Review

Prudential claims that it relied on the opinion of Dr. Lumpkins who found that Walters "was at the time of the injury to the finger[, June, 2003,] noted to be cutting his grass. Therefor[e] prior to the injury [Walters] was functional physically beyond that required of a sedentary position."[50] Walters argues that he was unaware that Prudential submitted his medical records to Reed Review Services, that his records were reviewed by Dr. Lumpkins, and that Prudential relied on Dr. Lumpkins opinion in making its decision to deny him benefits. Walters maintains that because he had no knowledge of Dr. Lumpkins' opinion, he was denied a full and fair review by Prudential.

---

[48] *See* Administrative Record at MCI 0164.

[49] *See* Administrative Record at MCI 0066.

[50] *See* Administrative Record at MCI 0025.

Under ERISA, a claimant is entitled to a full and fair review of adverse benefit determinations. 29 C.F.R. § 2560.503-1(h). "'The persistent core requirements' of full and fair review include 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his [or her] decision.'" *Abram v. Cargill, Inc.*, 395 F.3d 882, 886 (8th Cir. 2005) (quoting *Grossmuller v. Int'l Union, UAW*, 715 F.2d 853, 858 n. 5 (3d Cir. 1983)).

Applying the abuse of discretion standard, and considering the evidence in the record before the Plan administrator, the Court finds that it was unreasonable for Prudential to both ignore and fail to articulate its reasons for disagreeing with the opinions of Dr. Romano, Dr. Bagheri, and Laughlin with regard to whether Walters was disabled during the elimination period. The Court further finds that Prudential's failure to inform Walters that it relied heavily on the opinion of Dr. Lumpkins of Reed Review Services for its decision, denied him a full and fair hearing and the opportunity to address Dr. Lumpkins' findings. *See Abram*, 395 F.3d at 886. Therefore, the Court finds it appropriate to remand this matter to Prudential for further consideration and discussion of the opinions of Dr. Romano, Dr. Bagheri, and Laughlin with regard to whether Walters was disabled and incapable of performing his job duties during the elimination period and to provide Walters the opportunity to address Dr. Lumpkins' findings. *See Abram*, 395 F.3d at 887 ("A reviewing court must remand a case when the [plan administrator] fails to make adequate findings or explain the rationale for its decision."); *see also King*, 414 F.3d at 1005 ("The statute affords the courts a range of remedial powers under ERISA, 29 U.S.C. § 1132(a), and returning the case to a plan administrator for further consideration is often appropriate.").

### 4. IME and/or FCE

Walters argues that because the Plan allowed for an IME and Prudential disagreed with the opinions of his treating rheumatologists and medical expert that he suffered from fibromyalgia during the elimination period, it should have ordered him to submit to an IME. Walters further argues that because Prudential implicitly disagreed with Laughlin's opinions

regarding his ability to perform his job during the elimination period through the present by failing to consider her opinion, it should have ordered an FCE. Walters maintains that Prudential's failure to order an IME and/or FCE constitutes an abuse of discretion.

Under the Plan, Prudential is not required to make benefits claimants submit to an IME and/or FCE. Such evaluations are at the discretion of the Plan administrator. Applying the abuse of discretion standard, the Court finds Prudential's decision not to order Walters to submit to an IME and/or FCE reasonable and Walters' argument to be without merit.

### *VII. ATTORNEY FEES*

Pursuant to 29 U.S.C. § 1132(g)(1), a court may, in its discretion, award reasonable attorney fees and costs to either party under ERISA. 29 U.S.C. § 1132(g)(1).[51] A court considering whether to award attorney fees under ERISA should "'apply its discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts.'" *Welsh v. Burlington Northern, Inc., Employee Benefits Plan*, 54 F.3d 1331, 1342 (8th Cir. 1995) (quoting *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984)). "[A]lthough there is no presumption in favor of attorney fees in an ERISA action, a prevailing plaintiff rarely fails to receive fees." *Starr v. Metro Systems, Inc.*, 461 F.3d 1036, 1041 (8th Cir. 2006). *See also Martin v. Arkansas Blue Cross and Blue Shield*, 299 F.3d 966, 972 (8th Cir. 2002) ("[F]ew, if any, fee awards have been denied a prevailing plaintiff in ERISA cases nationwide. This is true even though nine of the circuit courts of appeals did not employ any kind of presumption in favor of fees. Thus, the absence of a presumption has obviously not doomed ERISA plaintiffs' attorney fee requests."). When determining whether to award fees, the Eighth Circuit has set forth the following five non-exclusive factors for consideration by a court exercising its discretion:

---

[51] 29 U.S.C. § 1132(g)(1) provides:
    (1) In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

(1) the degree of culpability or bad faith of the opposing party;
(2) the ability of the opposing party to pay attorney fees;
(3) whether an award of attorney fees against the opposing party
might have a future deterrent effect under similar circumstances;
(4) whether the parties requesting attorney fees sought to benefit
all participants and beneficiaries of a plan or to resolve a
significant legal question regarding ERISA itself; and (5) the
relative merits of the parties' positions.

*Starr*, 461 F.3d at 1041 (citing *Martin*, 299 F.3d at 969 and n.4).  Because the Court finds
that this matter should be remanded to Prudential for further consideration, and having
considered the factors set forth in *Starr*, the Court determines that neither party is entitled
to attorney fees at this time.

## VIII.  CONCLUSION

The Court concludes and recommends that this matter should be remanded to the plan
administrator for further consideration and discussion of the opinions of Dr. Romano,
Dr. Bagheri, and Laughlin regarding whether Walters was disabled and incapable of
performing his job duties during the elimination period and to provide Walters with the
opportunity to address the findings of Dr. Lumpkins.  The Court also recommends that
neither party be awarded attorney fees at this time.

## IX.  RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the District Court
**REMAND** this matter to the plan administrator for further proceedings as discussed herein
and **DENY** the award of attorney fees to both parties at this time.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1)(B), that within ten (10)
days after being served with a copy of these proposed findings and recommendations, any
party may serve and file written objections with the District Court.

DATED this 30th day of November, 2007.

_____
JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA

33